**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| KUNAL GEHI, Derivatively on Behalf of Nominal Defendant MONOLITHIC POWER SYSTEMS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL R. HSING, HERBERT CHANG, EUGEN ELMIGER, VICTOR K. LEE, JAMES C. MOYER, JEFF ZHOU, CARINTIA MARTINEZ, EILEEN WYNNE, and BERNIE BLEGEN,<br><br>Defendants,<br><br>and<br><br>MONOLITHIC POWER SYSTEMS, INC.,<br><br>Nominal Defendant. | Case No.: 2:26-cv-4669<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Kunal Gehi ("Plaintiff"), by and through Plaintiff's undersigned counsel, derivatively on behalf of Nominal Defendant Monolithic Power Systems, Inc. ("Monolithic" or the "Company"), brings this Verified Stockholder Derivative Complaint against Michael R. Hsing ("Hsing"), Herbert Chang ("Chang"), Eugen Elmiger ("Elmiger"), Victor K. Lee



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

("Lee"), James C. Moyer ("Moyer"), Jeff Zhou ("Zhou"), Carintia Martinez ("Martinez"), Eileen Wynne ("Wynne"), and Bernie Blegen ("Blegen") (collectively, the "Individual Defendants" and, together with Monolithic, "Defendants") for, among other things, their breaches of fiduciary duties and violations of the federal securities laws.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Monolithic with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *Waterford Township General Employees Retirement System v. Monolithic Power Systems, Inc. et al.*, Case No. 2:25-cv-00220 (W.D. Wash.) (the "Securities Class Action") and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a stockholder derivative action brought against certain officers and members of Monolithic's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants from February 8, 2024 to November 11, 2024 (the "Relevant Period").

2. During the Relevant Period, Monolithic executives represented to investors that the widespread adoption and use of the Company's products within the AI industry was due to the purportedly superior performance of Monolithic products. For example, during a February 2024 conference call, Defendant Hsing represented that Monolithic's customers were "very receptive" to the Company's products and claimed that client demand was increasing because Monolithic's products were able to "solve" issues within their systems. During a subsequent call with investors, Defendant Blegen similarly stated that Monolithic's products had gained a majority market share due to the Company's innovative solutions and claimed that Monolithic



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

could maintain its market leading position because the Company was working with clients, including Nvidia Corporation ("Nvidia"), on the development of their next-generation products.

3. Monolithic's filings with the SEC also emphasized the Company's purported specialization in semiconductor technologies and highlighted the supposed reliability and performance of Monolithic's products. For example, in quarterly reports filed throughout the Relevant Period, Monolithic represented that it possessed "innovative proprietary" technology and an "expertise" in semiconductor design and claimed that these advantages allowed the Company to deliver "reliable, compact, and monolithic solutions."

4. As a result of the demand for its purportedly superior products, Monolithic reported favorable revenue growth during the Relevant Period. For example, for the second fiscal quarter of 2024, Monolithic reported "record" quarterly revenue of $507 million. Monolithic attributed this unprecedented revenue growth in substantial part to increased customer demand for its AI power solutions, which had caused Enterprise Data revenue to increase 290% year-over-year to $187 million, from $48 million in the prior year quarter.

5. In the wake of these disclosures, analysts applauded Monolithic's financial results. For example, a Deutsche Bank analyst report stated that Monolithic was a "[b]eacon on a hill" compared to peers who, in contrast, had reported "relatively muted" financial results. Similarly, an Oppenheimer analyst report stated that Monolithic had reported "standout" results, making the Company a "Rose Among Thorns" given recent "peer malaise."

6. Unbeknownst to investors, however, Monolithic's power management solutions were suffering from significant performance and quality control issues, which, in turn, negatively impacted the graphic processing units ("GPUs") they powered like those supplied by Nvidia. Contrary to Defendants' Relevant Period representations that Monolithic had resolved quality issues with the components the Company supplied to Nvidia, Monolithic in fact failed to rectify known product defects that had impaired the performance of Nvidia's products. As a result of these shortcomings, Monolithic's relationship with Nvidia (its largest



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

customer) had been irreparably damaged, thereby exposing Monolithic to material undisclosed risks of significant business, financial, and reputational harm.

7. Then, on October 30, 2024, in connection with reporting its third fiscal quarter of 2024 financial results, Monolithic revealed a slowdown in its Enterprise Data segment. The Company disclosed that its Enterprise Data revenue had declined during the quarter to $184 million, missing consensus estimates by nearly 13%. During an investor call held later that day, Defendant Blegen revealed that customer order patterns had fallen materially below recent historical trends, which negatively impacted Enterprise Data sales in the quarter, and that this negative trend would continue.

8. On this news, Monolithic's stock price fell 17%, from a closing price of $919.81 on October 30, 2024 to a closing price of $759.30 on October 31, 2024.

9. Analysts attributed the unexpected slowdown in Monolithic's Enterprise Data sales to a delayed launch of Nvidia's next-generation Blackwell GPUs, initial sales of which had originally been scheduled to commence in the second quarter of 2024. For example, a Rosenblatt analyst report stated that Enterprise Data "took a pause for 4Q24, we think, on the delayed Blackwell ramp." Similarly, a Summit Insights Group analyst report stated that Monolithic's Enterprise Data sales in the quarter had underperformed expectations "primarily due" to Nvidia's Blackwell "shipment delays."

10. Then, on November 11, 2024, Edgewater Research analysts published an explosive report revealing that Nvidia had canceled half of its outstanding Monolithic orders and intended to eliminate Monolithic as a supplier for Nvidia's most-advanced Blackwell GPU variants due to persistent "[p]erformance issues" with the Company's power modules. The report further revealed that Nvidia engineers had "lost confidence" in Monolithic after it failed to address performance issues in its voltage regulator module and that Nvidia had decided to pivot to Monolithic's competitors as its "primary suppliers."



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

11. On this news, Monolithic's stock price fell a further 15%, from a closing price of $761.30 on November 8, 2024 to a closing price of $647.31 on November 11, 2024.

12. In light of the Individual Defendants' misconduct—which has subjected the Company to the Securities Class Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

## II. JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

16. Venue is proper in this court under 28 U.S.C. § 1391, because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## III. PARTIES

### A. Plaintiff

17. Plaintiff Kunal Gehi is a current stockholder of Monolithic and has continuously held Monolithic stock at all relevant times.

### B. Nominal Defendant

18. Nominal Defendant Monolithic is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 1555 Palm Beach Lakes Blvd., West Palm Beach, Florida 33401. Monolithic common stock trades on the Nasdaq under the ticker symbol "MPWR."

### C. Individual Defendants

19. Defendant Hsing is the Company's founder and has served as its President, Chief Executive Officer ("CEO") and the Chairman of the Board since 1997. According to the proxy statement filed on Schedule 14A with the SEC on April 29, 2024 (the "2024 Proxy"), in 2023, Defendant Hsing received $14,643,469 in total compensation from the Company.

20. Defendant Chang has been a director of the Company since September 1999. Defendant Chang currently serves as a member of the Audit Committee and the Compensation Committee. According to the 2024 Proxy, in 2023, Defendant Chang received $360,000 in total compensation from the Company.

21. Defendant Elmiger has been a director of the Company since October 2012. Defendant Elmiger currently serves as Chair of the Compensation Committee. According to the 2024 Proxy, in 2023, Defendant Elmiger received $320,000 in total compensation from the Company.

22. Defendant Lee has been a director of the Company since September 2006. Defendant Lee currently serves as a member of the Audit Committee. According to the 2024 Proxy, in 2023, Defendant Lee received $325,000 in total compensation from the Company.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

23. Defendant Zhou has been a director of the Company since February 2010. Defendant Zhou currently serves as a member of the Audit Committee and the Compensation Committee. According to the 2024 Proxy, in 2023, Defendant Zhou received $330,000 in total compensation from the Company.

24. Defendant Martinez has been a director of the Company since May 2021. Defendant Martinez currently serves as Chair of the Nominating and Corporate Governance Committee. According to the 2024 Proxy, in 2023, Defendant Martinez received $302,500 in total compensation from the Company.

25. Defendant Wynne has been a director of the Company since February 2023. Defendant Wynne currently serves as Chair of the Audit Committee. According to the 2024 Proxy, in 2023, Defendant Wynne received $295,000 in total compensation from the Company.

26. Defendant Moyer served as a director of the Company from October 1998 until his resignation, effective October 21, 2024. According to the 2024 Proxy, in 2023, Defendant Moyer received $295,000 in total compensation from the Company.

27. Defendants Hsing, Chang, Elmiger, Lee, Moyer, Zhou, Martinez, and Wynne are herein referred to as the "Proxy Defendants."

28. Defendant Blegen has served as the Company's Executive Vice President and Chief Financial Officer ("CFO") since July 2016. According to the 2024 Proxy, in 2023, Defendant Blegen received $4,619,944 in total compensation from the Company.

## IV. FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

29. As officers and/or directors of Monolithic, the Individual Defendants owed Monolithic fiduciary duties of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Monolithic in a fair, just, honest and equitable manner. The conduct of the Individual Defendants involves a knowing or reckless violation of their obligations as directors and officers of Monolithic, the absence of good faith on their part,



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

and a reckless disregard for their duties to the Company that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Monolithic, were able to and did exercise control over the wrongful acts complained of herein. As officers and/or directors of a publicly-traded company, the Individual Defendants had a duty to prevent the dissemination of inaccurate and untruthful information regarding Monolithic's financial condition, performance, growth, operations, financial statements, business, management, earnings, internal controls, and business prospects, so as to ensure that the market price of the Company's common stock would be based upon truthful and accurate information.

31. To discharge their duties, the officers and directors of Monolithic were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Monolithic were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Monolithic's Code of Ethics and Business Conduct (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Monolithic conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Monolithic and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Monolithic operations would comply with all applicable laws and Monolithic financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's stockholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32. Each of the Individual Defendants further owed to Monolithic and its stockholders the duty of loyalty requiring that each favor Monolithic's interest and that of its stockholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

33. At all times relevant hereto, the Individual Defendants were the agents of each other and of Monolithic and were at all times acting within the course and scope of such agency.

34. Because of their advisory, executive, managerial, directorial, and controlling positions with Monolithic, each of the Individual Defendants had access to adverse, nonpublic information about the Company.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

35. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Monolithic.

## V. CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

36. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37. The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act.

38. The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Monolithic was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

39. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

40. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Monolithic and was at all times acting within the course and scope of such agency.

## VI. MONOLITHIC'S CODE OF ETHICS AND BUSINESS CONDUCT

41. Monolithic maintains a Code of Ethics and Business Conduct (the "Code of Ethics"). The version of the Code of Ethics that was in place during the Relevant Period states that it "is designed to deter wrongdoing and to promote" "[h]onest and ethical conduct," "[f]ull, fair, accurate, timely and understandable disclosure in reports and documents we file with or submit to the U.S. Securities and Exchange Commission and in our other public communications," "[c]ompliance with applicable laws, rules and regulations," "[t]he prompt internal reporting of violations of this Code," and "[a]ccountability for adherence to this Code." The Code of Ethics also states that it "applies to all directors, officers and employees of the company and its subsidiaries." In a section titled "General Standards of Conduct," under the subsection "Compliance with law," the Code of Ethics stated:

> Obeying the law, both in letter and spirit, is the foundation on which this company's ethical standards are built. All employees, agents and consultants should seek in good faith to adhere to and comply with the laws, rules, regulations and regulatory orders applicable to the conduct of our business. If you are located or engaging in business outside of the United States, you should seek in good faith to adhere to and comply with laws, rules, regulations and regulatory orders of the United States, including the Foreign Corrupt Practices Act and U.S. export rules and regulations, in addition to the applicable laws of other jurisdictions. Although not all employees are expected to know the details of these laws, it is important to know enough to determine when to seek advice from managers or other appropriate personnel. If compliance with the Code should ever conflict with the law, you must comply with the law.
>
> Violations of laws, rules, regulations and orders may subject you to individual criminal or civil liability, in addition to discipline by the company. Violations may also subject the company to civil or criminal liability or the loss of business.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

42. In a section titled "Avoiding Conflicts of Interests," the Code of Ethics stated, in relevant part:

> Your decisions and actions in the course of your employment with the company should be based on the best interest of the company, and not based on personal relationships or benefits. You should seek to avoid situations where your personal activities and relationships conflict, or appear to conflict, with the interests of the company, except under guidelines approved by the Board of Directors. This includes situations where you may have or appear to have an indirect conflict through, for example, a significant other or a relative or other persons or entities with which you have a relationship. A conflict may also arise when you take actions or have interests that make it difficult for you to perform your work for the company objectively and effectively. You must disclose to your manager any interest that you have that may, or may appear to, conflict with the interests of the company.

43. In a section titled "Public Communications," the Code of Ethics stated, in relevant part:

> Depending upon your position with the company, you may be called upon to provide information to help assure that the company's public reports and communications are complete, fair, accurate and understandable. You are expected to use all reasonable efforts to provide complete, accurate, objective, relevant, timely and understandable answers to inquiries related to the company's public disclosures. Individuals involved in the preparation of public reports and communications must use all reasonable efforts to comply with our disclosure controls and procedures, which are designed to ensure full, fair, accurate, timely and understandable disclosure in our public reports and communications. If you believe that any disclosure is materially misleading or if you become aware of any material information that you believe should be disclosed to the public, it is your responsibility to bring this information to the attention of the Chief Financial Officer, the General Counsel or the Audit Committee pursuant to the Whistleblower Procedures described in Section XI below.

44. In a section titled "Financial Reporting," the Code of Ethics stated, in relevant part:

> It is important that those who rely on records and reports—managers and other decision makers, creditors, customers and auditors—have complete, accurate and timely information. False, misleading or incomplete information undermines the company's ability to make good decisions about resources, employees and programs and may, in some cases, result in violations of law. Anyone involved in preparing financial or accounting records or reports, including financial statements and schedules, must be diligent in assuring that those records and reports are complete, accurate and timely. Anyone representing or certifying as to the accuracy of such records and reports should



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> make an inquiry or review adequate to establish a good faith belief in their accuracy.

45. In a section titled "Keeping the Audit Committee informed," the Code of Ethics stated the following:

> The Audit Committee plays an important role in ensuring the integrity of our public reports. If you believe that questionable accounting or auditing conduct or practices have occurred or are occurring, you should notify the Audit Committee of the Board of Directors. In particular, the Chief Executive Officer and senior financial officers such as the Chief Financial Officer and the Controller should promptly bring to the attention of the Audit Committee any information of which he or she may become aware concerning, for example:
>
> - the accuracy of material disclosures made by the company in its public filings;
> - significant deficiencies in the design or operation of internal controls or procedures that could adversely affect the company's ability to record, process, summarize or report financial data;
> - any evidence of fraud that involves an employee who has a significant role in the company's financial reporting, disclosures or internal controls or procedures; or
> - any evidence of a material violation of the policies in this Code regarding financial reporting.

46. In a section titled "Whistleblower Procedures," the Code of Ethics stated, in relevant part:

> If you have reason to believe that you have become aware of a possible violation of this Code or applicable law, you must immediately report the possible violation. Examples of reportable actions include, but are not limited to, any indication of fraud, misappropriation of company resources, substantial variation in our financial reporting methodology from prior practice or from generally accepted accounting principles, disclosures in reports filed with the SEC and other public disclosures that are not full, fair, accurate, timely and understandable, conduct that is not honest and ethical, conflicts of interest, potential violations of governmental rules and regulations or this Code, and the falsification, concealment or inappropriate destruction of corporate or financial records.
>
> * * *
>
> All complaints under this policy will be taken seriously and will be promptly and thoroughly investigated. MPS's General Counsel is our Chief Compliance Officer and is responsible for both investigating all allegations and reporting the outcome of those investigations to MPS's Audit Committee. The application of policies, along with MPS's responsibility to investigate, applies to allegations raised by both our employees and those from our suppliers and subcontractors. The General Counsel has full discretion to employ all resources necessary based



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> on the nature of the allegation to ascertain the facts and circumstances necessary to draw an objective conclusion.
>
> * * *
>
> If, at the conclusion of its investigation, the company determines that a violation of our legal duties or policies has occurred, we will take remedial action commensurate with the severity of the offense. That action may include disciplinary action against the accused party, up to and including termination. The specific action taken in any particular case depends on the nature and gravity of the conduct or circumstances reported and the quality of the information provided. Reasonable and necessary steps will also be taken to prevent any further violations of law or policy.

47. In a section titled "Procedural Matters," under the subsection titled "Approvals and waivers," the Code of Ethics stated:

> Except as otherwise provided in the Code, the Board of Directors or the Audit Committee must review and approve any matters requiring special permission under the Code for a member of the Board of Directors or an executive officer. Except as otherwise provided in the Code, the Chief Financial Officer must review and approve any matters requiring special permission under the Code for any other employee, agent or consultant.
>
> Any waiver of any provision of this Code for a member of the Board of Directors or an executive officer must be approved in writing by the Board of Directors or the Audit Committee and promptly disclosed, along with the reasons for the waiver, to the extent required by law or regulation. Any waiver of any provision of this Code with respect to any other employee, agent or consultant must be approved in writing by the Chief Financial Officer or General Counsel.

48. In violation of the Code of Ethics, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Ethics, the Individual Defendants failed to maintain the accuracy of Monolithic's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Ethics.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## VII. MONOLITHIC'S AUDIT COMMITTEE CHARTER

49. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is as follows:

> - Provide oversight of the Company's accounting and financial reporting processes and the audit of the Company's financial statements;
> - Appoint independent auditors to audit the Company's financial statements and carry out the other audit committee requirements set forth in Rule 10A-3 promulgated under the Securities Exchange Act of 1934;
> - Assist the Board in the oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications, independence and performance; and (iv) the Company's internal accounting and financial controls; and
> - Provide to the Board such information and materials as it may deem necessary to make the Board aware of financial matters requiring the attention of the Board.
>
> In addition, the Audit Committee will undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

50. In the section titled "Power and Responsibilities," under the subheading "Review Procedures," the Audit Committee Charter states, in pertinent part:

> - Reviewing the reports of management and the independent auditors concerning the design, implementation and maintenance of the Company's system of internal controls and procedures for financial reporting, including meeting periodically with the Company's management and the independent auditors to review their assessment of the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and, when applicable, required attestations or reports by the independent auditors relating to such disclosure;
> - Reviewing and overseeing the external audit by (i) reviewing the independent auditors' proposed audit scope and approach; (ii) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies and disagreements with



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

management and any other matters described in Public Company Accounting Oversight Board (PCAOB) section AU 380, or any successor rule or any similar applicable rule or regulation, or other relevant matters; (iii) reviewing with the independent auditors the Company's critical accounting policies and practices, alternative treatments of financial information within generally accepted accounting principles that have been discussed with management and the treatment recommended by the independent auditors, and other material written communications between the independent auditors and management; and (iv) reviewing reports submitted to the Audit Committee by the independent auditors in accordance with the applicable SEC requirements;

- Reviewing before release the unaudited quarterly operating results in the Company's quarterly earnings release, and reviewing and discussing the annual audited financial statements and quarterly unaudited financial statements with management, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

* * *

- Recommending to the Board of Directors, if deemed appropriate, that the audited financial statements be included in the Company's Annual Report on Form 10-K, in accordance with the rules and regulations of the SEC;

- Reviewing with the Company's independent auditors, before filing with the SEC, the results of the independent auditor's review of the Company's interim financial statements included in Quarterly Reports on Form 10-Q; and

- Conducting a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors and management's response to such suggestions.

51. In the same section, under the subheading "Independent Auditors[,]" the Audit Committee Charter states the following:

- Be directly responsible for appointing, compensating, retaining and overseeing the work of the independent auditor (including resolving disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company;

- Reviewing the independence of the outside auditors, including (i) obtaining on a periodic basis a written statement from the independent auditors regarding relationships and services with the Company that may impact independence, as defined by applicable standards and SEC requirements, and



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

discussing with the independent auditors their independence, (ii) presenting this statement to the Board, and (iii) to the extent there are relationships, monitoring and investigating them; and

- Pre-approving audit and permissible non-audit services provided to the Company by the independent auditor, except where pre-approval of audit and permissible non-audit services is not required under (i) pre-approval policies and procedures established by the Audit Committee, provided, the Audit Committee is informed of each service provided and such policies and procedures do not include delegation of the Audit Committee's responsibilities, or (ii) are de minimis under the rules of the SEC. The Audit Committee may delegate to one or more designated members of the Audit Committee the authority to pre-approve audit and permissible non-audit services, provided such pre-approvals are presented to the Audit Committee at a subsequent meeting.

52. In the same section, under the subheading "Other Powers and Responsibilities[,]" the Audit Committee Charter states, in pertinent part:

- Reviewing all related party transactions on an ongoing basis and all such transactions must be reviewed and approved in advance by the Audit Committee;

- Discussing with the Company's General Counsel or outside counsel any legal matters brought to the Audit Committee's attention that could reasonably be expected to have a material impact on the Company's financial statements;

- Discussing with management the Company's policies with respect to risk assessment and risk management;

- Establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by employees regarding questionable accounting or auditing matters and reporting to the Board periodically on any such complaints or submissions;

* * *

- Reviewing approving and monitoring the Company's code of ethics for its principal executive and senior financial officers.

53. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty,



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## VIII. SUBSTANTIVE ALLEGATIONS

### A. Background

54. Monolithic is a provider of power management components that are used in broader electronic systems. Monolithic's power management products function by converting voltages to the appropriate wattage required for use by an electronic system. Although Monolithic's power control modules are used across a broad range of application settings, the products are most notably used in artificial intelligence ("AI") data center applications.

55. To sell its products, Monolithic claims it relies on a staff of technical sales and applications engineers who assist prospective customers with the design and use of the Company's products and in the development of the customers' own products. According to Monolithic, this process enables the Company to meet customers' exacting specifications for quality and performance and promotes future product sales.

56. Monolithic reports its financial and operational results under a single operating segment. However, the Company also reports revenue generated by sales into various end markets. Chief among these end markets is Enterprise Data, which includes sales of power management modules to technology companies engaged in supplying GPUs that are used to run and operate AI data servers. Nvidia – the world's leading supplier of GPUs – is Monolithic's largest customer.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

57. Due to intense demand for AI applications, global technology companies have poured hundreds of billions of dollars into the construction of data centers necessary for the development of AI technologies. Amid this influx of AI-related capital, Nvidia launched the "Hopper" GPU in late 2022, which was used to construct the next wave of AI data centers.

58. As the sole supplier of certain power modules used in Nvidia's Hopper GPUs, Monolithic benefitted from the downstream effects of the growing demand for AI infrastructure. For example, following the launch of Nvidia's Hopper GPUs, Monolithic's Enterprise Data business quickly became the Company's largest and fastest growing unit, jumping from 11% of total sales in the second fiscal quarter of 2023 to roughly 27% of sales the following quarter. By the end of the fourth quarter of 2023, Enterprise Data had become Monolithic's largest business segment, representing approximately 28% of the Company's overall sales.

**B. False and Misleading Statements**

59. After close of market on February 7, 2024, Monolithic issued a press release announcing the Company's financial results for its fourth fiscal quarter and year ending December 31, 2023 ("4Q23 Press Release"). The 4Q23 Press Release stated that Monolithic's quarterly revenues decreased to $454 million from $460 million in the prior year quarter. The 4Q23 Press Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $129 million from $68 million in the prior year quarter.

60. That same day, Monolithic held a conference call with analysts to discuss the Company's financial and operational results for the fourth quarter of 2023, which was hosted by Defendants Hsing and Blegen. During the call, Defendant Hsing emphasized the exceptional "performance" of Monolithic's power solutions and claimed that the Company's customers kept "requesting it" because Monolithic's products could solve "all [of their] issues," and were designed "to make sure we're the best."



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

61. Defendant Hsing further stated that Monolithic had experienced "some issues" with its power management Stage 1 components, but reassured investors that "all these issues are resolved," which he claimed would enable Monolithic to "significantly" increase the amount of products installed on customer projects, stating in pertinent part as follows:

> Yes, okay. We had some issues on the Stage 1. We had some design wins and very small volumes in different systems, actually. Now we don't have – all these issues are resolved. That will significantly gain the content. And in each AR systems.

62. That same day, analysts at Truist Securities published an analyst report stating that Monolithic had acknowledged a "quality issue" with components supplied to Nvidia, but reassured investors that the Company had "identified the problem, the failure rate is low, the problem is fixed, and the relationship remains on solid footing."

63. On February 29, 2024, Monolithic filed with the SEC its annual report on Form 10-K for its fiscal year ending December 31, 2023 (the "2023 Form 10-K"), which was signed by Defendants Hsing, Blegen, Chang, Elmiger, Lee, Moyer, Martinez, Wynne, and Zhou. Appended to the 2023 Form 10-K were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), certifying that the filing was materially complete, accurate, and free from fraud. The 2023 Form 10-K contained the same financial information regarding Monolithic's quarterly and annual revenues that were reflected in the 4Q23 Press Release.

64. The 2023 Form 10-K represented that Monolithic had "core strengths" in design expertise and proprietary technologies, which it claimed enabled the Company to deliver "reliable" and "cost-effective" products. The 2023 Form 10-K also stated that Monolithic "differentiate[d]" itself "by offering solutions that are . . . more accurate with respect to performance specifications and, consequently, more cost-effective than many competing solutions."



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

65. The 2023 Form 10-K also represented that Monolithic's power management solutions were "differentiated" in the market due, in part, to their "increased reliability" and "lower" system cost relative to competing products.

66. On May 1, 2024, Monolithic issued a press release announcing the Company's financial results for its first fiscal quarter ending March 31, 2024 ("1Q24 Press Release"). The 1Q24 Press Release stated that Monolithic's quarterly revenues increased to $458 million from $451 million in the prior year quarter. The 1Q24 Press Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $150 million from $47 million in the prior year quarter.

67. That same day, Monolithic hosted a conference call with analysts to discuss the Company's financial and operational results for the first quarter of 2024, which was hosted by Defendants Hsing and Blegen. In response to a question from an analyst regarding the Company's relationship with its "largest enterprise data customer" (i.e., Nvidia), Defendant Blegen represented that Monolithic was "at the front of the design cycle, we're consulted, we're integrated, in fact, with the development of the next generation of products" and claimed that the Company was strategically positioned to continue to be a "leader" in the market for such products.

68. Defendant Hsing responded to the same question by emphasizing Monolithic's purported quality advantages, stating: "[W]e are not a champion of volumes, okay? We don't do that. We want to every – whatever we do, we do the best."

69. On May 3, 2024, Monolithic filed with the SEC a quarterly report on Form 10-Q for its first fiscal quarter ending March 31, 2024 (the "1Q24 Form 10-Q"), which was signed by defendants Hsing and Blegen. Appended to the 1Q24 Form 10-Q were SOX certifications, signed by Defendants Hsing and Blegen, certifying that the filing was materially complete, accurate and free from fraud. The 1Q24 Form 10-Q contained the same



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

financial information regarding Monolithic's quarterly revenues that were reflected in the 1Q24 Press Release.

70. The 1Q24 Form 10-Q represented that Monolithic had "core strengths" in design expertise and proprietary technologies, which it claimed enabled the Company to deliver "reliable" and "cost-effective" products "while providing a consistent return on investment to our stockholders."

71. On August 1, 2024, Monolithic issued a press release announcing the Company's financial results for its second fiscal quarter ending June 30, 2024 ("2Q24 Press Release"). The 2Q24 Press Release stated that Monolithic's quarterly revenues increased to $507 million from $441 million in the prior year quarter. The 2Q24 Press Release further stated that quarterly revenues within the Company's Enterprise Data business increased to $187 million from $48 million in the prior year quarter.

72. That same day, Monolithic held a conference call with analysts to discuss the Company's financial and operational results for the second quarter of 2024, which was hosted by Defendants Hsing and Blegen. During his prepared remarks, Defendant Blegen emphasized Monolithic's "record" revenue growth, which he attributed in substantial part to increased demand for the Company's AI power solutions, stating in pertinent part as follows:

> Let me open by saying MPS reported yet another record quarter, with Q2 2024 revenue of $507.4 million, exceeding the high end of our guidance. Our strong revenue growth was attributed to three factors: increased demand for AI power solutions, improving order trends in several of our end markets, and lastly, initial revenue ramps associated with design wins secured in past years.

73. On August 2, 2024, Monolithic filed with the SEC a quarterly report on Form 10-Q for its second quarter ending June 30, 2024 (the "2Q24 Form 10-Q"), which was signed by defendants Hsing and Blegen. Appended to the 2Q24 Form 10-Q were SOX certifications, signed by Defendants Hsing and Blegen, certifying that the filing was materially complete,



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

accurate and free from fraud. The 2Q24 Form 10-Q contained the same financial information regarding Monolithic's quarterly revenues that were referenced in the 2Q24 Press Release.

74. The 2Q24 Form 10-Q represented that Monolithic had "core strengths" in design expertise and proprietary technologies, which it claimed enabled the Company to deliver "reliable" and "cost-effective" products "while providing a consistent return on investment to our stockholders."

75. The foregoing statements were materially false and misleading, and failed to disclose materially adverse facts about the Company's business and operations. Specifically, the statements failed to disclose that: (a) Monolithic's voltage regulator modules and power management integrated circuits were suffering from significant performance and quality control issues; (b) those defects had negatively impacted the performance of certain products offered by Nvidia in which such products were used; (c) Monolithic had failed to adequately address and resolve known issues affecting the performance of the power management solutions the Company supplied to Nvidia; (d) Monolithic's relationship with Nvidia had been irreparably damaged due to the significant performance and quality control problems affecting the products it supplied to Nvidia and the Company's failure to adequately address such issues; and (e) as a result of the foregoing, Monolithic was acutely exposed to material undisclosed risks of significant business, financial, and reputational harm.

**C. The Truth is Revealed**

76. Then, on October 30, 2024, Monolithic issued a press release announcing the Company's financial results for its third fiscal quarter ending September 30, 2024 ("3Q24 Press Release"). The 3Q24 Press Release revealed a sudden and surprising slowdown in Monolithic's critical Enterprise Data segment. Specifically, the 3Q24 Press Release reported that quarterly revenue within Monolithic's Enterprise Data business declined sequentially to $184 million, down from $187 million in the prior quarter, missing consensus estimates of $211 million by nearly 13%. During the corresponding conference call held later that day,



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Defendant Blegen further revealed that customer orders had fallen materially below recent historical trends, which had negatively impacted Monolithic's Enterprise Data revenues and was set to limit segment revenue growth in the upcoming quarter to low single digits.

77. During a corresponding third quarter earnings call, Defendant Hsing represented that Monolithic's provision of "best"-in-class power solutions had allowed the Company to maintain a dominant initial share of the burgeoning AI market, stating in pertinent part as follows:

> Yes. I mean you probably – everybody knows that if you look at the transcript from the last year, we talked about the market is big and that the market is growing or the AI requirements is growing. And so the customers initially will take the – always take the best solutions to fulfill their needs and the best solution and also the speed of the development service, as Bernie said earlier. And that's why we occupied a pretty large shares, okay?
>
> And last year, we said, okay, this market is too big and MPS will be always have the best solutions in these applications. And we also talk about the market is bigger. There will be a second or third or fourth supplier to join this segment. And this – and when will that happen, and we don't know, okay? It happened in the last couple of quarters. And again, in next years, what we see – again, the market is growing very fast.

78. During the call, an analyst asked about Monolithic's "opportunity" within AI accelerators in the upcoming year. In response, defendant Hsing stated that Monolithic's power solutions were the "best" and "most power efficient" in the industry, and represented to investors that the Company's Enterprise Data business "will grow."

79. In the wake of these disclosures, analysts reported that Monolithic's lackluster sales within its Enterprise Data segment were due to Nvidia's shipment delays of its next-generation Blackwell chips. For example, a Rosenblatt analyst report stated that Monolithic's Enterprise Data segment "took a pause for 4Q24, we think, on the delayed Blackwell ramp." Similarly, a Summit Insights Group analyst report stated that the Company's Enterprise Data sales in the third quarter had underperformed expectations "primarily due" to Nvidia's Blackwell "shipment delays."



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

80. On this news, the price of Monolithic common stock fell from $919.81 per share on October 30, 2024 to $759.30 per share on October 31, 2024, a decline of more than 17% on above-average trading volume.

81. Then, on November 11, 2024, Edgewater Research analysts published an explosive report revealing that Nvidia had cancelled half of its outstanding Monolithic orders and intended to eliminate Monolithic's allocation to most variants of its next-generation Blackwell chips due to "[p]erformance issues" with the Company's products. The report further disclosed that Nvidia engineers had "lost confidence" in Monolithic's products and decided to turn to the Company's competitors as Nvidia's "primary suppliers." Corroborating these claims, the report noted that Monolithic's competitors had received "rush orders" in recent weeks for components related to Nvidia's most-advanced Blackwell models.

82. On this news, the price of Monolithic common stock fell from $761.30 per share on November 8, 2024 to $647.31 per share on November 11, 2024, a decline of 15% on above-average trading volume.

83. While Monolithic attempted to refute the disclosures contained in the Edgewater Research report, the market found the claims credible and concerning. Moreover, later reports revealed that Nvidia decided to ramp initial Blackwell volumes using competing multi-phase solutions from Monolithic's competitors, Infineon and Renesas. As a result, in subsequent trading days the price of Monolithic stock continued to fall, reaching a low of $560 per share on November 20, 2024.

**D. Proxy Statements**

84. The Proxy Defendants caused the Company to issue a false and misleading proxy statement during the Relevant Period, the 2024 Proxy, which sought stockholder votes to, among other things, reelect Defendants Elmiger, Wynne, and Zhou to serve on the Board.

85. The Proxy Defendants drafted, approved, reviewed, and/or signed the 2024 Proxy before it was filed with the SEC and disseminated to Monolithic's stockholders. The



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Proxy Defendants negligently issued materially misleading statements in the 2024 Proxy. These allegations are based solely on negligence, they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Proxy Defendants and they do not allege or sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the 2024 Proxy allegations and related claims.

86. In support of reelecting Defendants Elmiger, Wynne, and Zhou, the Proxy Defendants highlighted their supposed oversight of the Company in the 2024 Proxy. The 2024 Proxy stated:

> The Board is primarily responsible for the oversight of risks that could affect MPS. The Board believes that a fundamental part of risk management is understanding the risks that we face, monitoring these risks, and adopting appropriate controls and mitigation activities for such risks. We believe that the risk management areas that are critical to our long-term success primarily include product development, supply chain and quality, regulations and legal compliance, ESG, executive compensation programs, sales and promotions, and business development, as well as protection of our assets (financial, intellectual property and cybersecurity), all of which are managed by senior executive management reporting directly to our Chief Executive Officer. Our Board members have extensive experience in risk oversight arising from their current or prior experience as chief executive officers, chief financial officers, chief information officers, as well as other senior leadership positions or board members of other companies with responsibility for risk oversight obligations. As such, the Board believes that its members are qualified and experienced at identifying and addressing risk throughout our operations.

87. The 2024 Proxy thus assured stockholders that the Proxy Defendants understood Company-wide risks, actively oversaw the Company's risks and exposures, as well as steps taken to monitor and mitigate risk exposures. In reality, the Proxy Defendants were utterly failing in their oversight duties by allowing the Company to operate with inadequate internal controls which resulted in the failure to disclose that: (a) Monolithic's voltage regulator modules and power management integrated circuits were suffering from significant performance and quality control issues; (b) those defects had negatively impacted



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

the performance of certain products offered by Nvidia in which such products were used; (c) Monolithic had failed to adequately address and resolve known issues affecting the performance of the power management solutions the Company supplied to Nvidia; (d) Monolithic's relationship with Nvidia had been irreparably damaged due to the significant performance and quality control problems affecting the products it supplied to Nvidia and the Company's failure to adequately address such issues; and (e) as a result of the foregoing, Monolithic was acutely exposed to material undisclosed risks of significant business, financial, and reputational harm.

88. As a result of these misleading statements, the Company's stockholders voted via an uninformed stockholder vote to reelect Defendants Elmiger, Wynne, and Zhou to the Board.

## IX. DAMAGES TO THE COMPANY

89. As a direct and proximate result of the Individual Defendants' conduct, the Company has been harmed and will continue to be.

90. The harm includes, but is not limited to, the costs already incurred and to be incurred defending the Company in the Securities Class Action, as well as costs to be incurred in remediating deficiencies in the Company's internal controls.

91. Such expenditures will also include costs incurred in any internal investigation pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

92. As a direct and proximate result of the Individual Defendants' conduct, Monolithic has suffered and will continue to suffer a loss of reputation and goodwill and a "liar's discount" that will plague the Company's stock in the future due to the Company's actions and misrepresentations and the Individual Defendants' breaches of fiduciary duties.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## X. DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

93. Plaintiff brings this action derivatively in the right and for the benefit of Monolithic to redress injuries suffered by Monolithic as a direct result of the Individual Defendants' breaches of fiduciary duty.

94. Monolithic is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is, and has been at all relevant times, a stockholder of Monolithic common stock and was a Monolithic stockholder at the time of the misconduct alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation. Plaintiff will adequately and fairly represent the interests of Monolithic in enforcing and prosecuting the Company's rights.

95. A pre-suit demand on the Board of Monolithic is futile and, therefore, excused. At the time this action was commenced, the Board was comprised of the following seven individuals: Defendants Hsing, Chang, Elmiger, Lee, Zhou, Martinez, and Wynne (the "Director Defendants").

96. Plaintiff did not make a pre-suit demand on the Board to bring this action because such a demand would have been futile. Under Delaware law, demand is excused where at least half of the directors received a material personal benefit, face a substantial likelihood of liability, or lack independence from someone who does. Each of those circumstances is present here.

97. As detailed above, each of the Director Defendants negligently caused the Company to issue the materially false and misleading 2024 Proxy, which solicited stockholder



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

votes to reelect Defendants Elmiger, Wynne, and Zhou to the Board. Because Section 14(a) liability may rest on negligence alone, each Director Defendant faces a substantial likelihood of liability for the 2024 Proxy, and none can impartially consider a demand to sue over it.

98. Each Director Defendant also faces a substantial likelihood of liability for his or her own conduct. The Director Defendants were responsible for ensuring that the Company's SEC filings, press releases, earnings calls, and other public statements concerning its business, operations, prospects, internal controls, and financial condition were accurate and complete. Yet they permitted the Company to tout the quality of its power solutions and the strength of its Nvidia relationship while concealing the product defects and the deterioration of that relationship described above.

99. The Director Defendants were further obligated to exercise good-faith oversight to ensure that the Company maintained, and effectively implemented, adequate internal and disclosure controls, and that the Board itself discharged its duties with diligence and due care. The 2024 Proxy expressly identified "product development" and "supply chain and quality" as risk areas critical to the Company's long-term success. Despite that acknowledgment, the Director Defendants knowingly or recklessly reviewed, approved, and/or caused the dissemination of the materially false and misleading statements described above, which artificially inflated the price of Monolithic stock and misrepresented the Company's true financial and operational health.

100. By making or authorizing these statements, failing to correct them, and failing to ensure that adequate internal controls and reporting systems were in place and functioning, the Director Defendants breached their fiduciary duties of loyalty, good faith, and candor. Such conduct is not protected by the business judgment rule and cannot be exculpated under any provision of the Company's certificate of incorporation, because a bad-faith failure of oversight breaches the duty of loyalty. The Director Defendants therefore face a substantial likelihood of personal liability, and they cannot be expected to cause Monolithic to sue



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

themselves and their fellow directors to recover the damages their own misconduct inflicted. Demand is therefore futile as to each Director Defendant, who together comprise the entire seven-member Board.

101. Defendant Hsing founded Monolithic in 1997 and has served as its President, CEO, and Chairman ever since. Hsing received $14,643,469 in total compensation from the Company in 2023 and depends on Monolithic for his income. The Company has also acknowledged in the 2024 Proxy that Hsing is not an independent director under applicable SEC and Nasdaq rules.

102. Hsing also personally made many of the misleading statements alleged herein, including on the February 7, 2024, May 1, 2024, and October 30, 2024 earnings calls, and he signed and certified the 2023 Form 10-K and the 1Q24 and 2Q24 Forms 10-Q. He thus faces a substantial likelihood of liability as both a director and an officer and cannot impartially consider a demand to sue himself.

103. Defendants Chang, Lee, Zhou, and Wynne served on the Company's Audit Committee during the Relevant Period (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and the audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

104. The Director Defendants, as members of the Board, were and are subject to the Company's Code of Ethics. The Code of Ethics goes well beyond the basic fiduciary duties



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Ethics because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

105. The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the stockholders of the Company. Accordingly, demand is excused as being futile.

106. The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Monolithic. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Monolithic, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

107. If there is no directors' and officers' liability insurance, then the directors will not cause Monolithic to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

108. Thus, for all of the reasons set forth above, a majority of Monolithic's current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## XI. CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

109. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

110. The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

111. Each of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, candor and oversight to the Company.

112. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

113. In addition, the Individual Defendants further breached their fiduciary duties owed to Monolithic by willfully or recklessly making and/or causing the Company to make



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

false and misleading statements and omissions of material fact and allowing the Company to operate with inadequate internal controls which resulted in the misrepresentations and failure to disclose that: (a) Monolithic's voltage regulator modules and power management integrated circuits were suffering from significant performance and quality control issues; (b) those defects had negatively impacted the performance of certain products offered by Nvidia in which such products were used; (c) Monolithic had failed to adequately address and resolve known issues affecting the performance of the power management solutions the Company supplied to Nvidia; (d) Monolithic's relationship with Nvidia had been irreparably damaged due to the significant performance and quality control problems affecting the products it supplied to Nvidia and the Company's failure to adequately address such issues; and (e) as a result of the foregoing, Monolithic was acutely exposed to material undisclosed risks of significant business, financial, and reputational harm.

114. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the wrongdoing set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the wrongdoing set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the wrongdoing and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

115. As a direct and proximate result of the breaches of duty alleged herein, Monolithic has sustained and will sustain significant damages.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

116. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

117. Plaintiff, on behalf of Monolithic, has no adequate remedy at law.

## COUNT II

### Against the Proxy Defendants for Violation of Section 14(a) of the Exchange Act

118. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

119. The Proxy Defendants violated § 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC.

120. The Proxy Defendants, individually and in concert, disseminated and/or permitted the dissemination of materially false and misleading statements in the 2024 Proxy filed with the SEC.

121. The 2024 Proxy was used to solicit stockholder votes in connection with the reelection of Defendants Elmiger, Wynne, and Zhou to the Company's Board.

122. The 2024 Proxy misrepresented and failed to disclose the Board's risk oversight and the Company's inadequate internal controls, which facilitated the illegal behavior described herein. By reason of the conduct alleged herein, the Proxy Defendants violated section 14(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, Monolithic misled and deceived its stockholders by making



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

materially misleading statements that were essential links in stockholders following the Company's recommendation and voting to reelect the Defendants Elmiger, Wynne, and Zhou.

123. Plaintiff, on behalf of Monolithic, thereby seeks relief for damages inflicted upon the Company based upon the 2024 Proxy in connection with the improper reelection of Defendants Elmiger, Wynne, and Zhou to the Board.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

124. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Monolithic.

126. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Monolithic that were tied to the performance or artificially inflated valuation of Monolithic, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

127. Plaintiff, as a stockholder and a representative of Monolithic, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

128. Plaintiff, on behalf of Monolithic, has no adequate remedy at law.



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## COUNT IV

**Against the Individual Defendants for Waste of Corporate Assets**

129. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time-period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

131. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

132. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

133. Plaintiff, on behalf of Monolithic, has no adequate remedy at law.

## XII. RELIEF REQUESTED

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of Monolithic and that Plaintiff is a proper and adequate representative of the Company;

B. Against all of the Individual Defendants and in favor of Monolithic for the amount of damages sustained by the Company as a result of the acts and transactions complained of herein;

C. Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;



CORR CRONIN LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

D. Awarding Monolithic restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

E. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

F. Granting such other and further equitable relief as this Court may deem just and proper.

## XIII. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 25, 2026

Respectfully submitted,

**CORR CRONIN LLP**

*/s/ Colin M. George*
Colin M. George, WSBA No. 45131
1015 Second Avenue, 10th Floor
Seattle, WA 98104-1001
Telephone: (206) 625-8600
cgeorge@corrcronin.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*